# State of New York
# Court of Appeals

OPINION

This opinion is uncorrected and subject to revision before publication in the New York Reports.

No. 25
Daniel Williams et al.,
  Appellants,
   v.
Beemiller, Inc. &c., et al.,
  Defendants,
Charles Brown,
  Respondent.

Jonathan E. Lowy, for appellants.
Scott L. Braum, for respondent.
Everytown for Gun Safety; American Association for Justice, amici curiae.

DiFIORE, Chief Judge:

This case involves the propriety of New York's exercise of long-arm jurisdiction over defendant Charles Brown, an Ohio firearm merchant who sold a gun to an Ohio resident in Ohio which was subsequently resold on the black market and used in a shooting

in New York. We agree with the Appellate Division that, under the circumstances presented in this case, jurisdiction cannot be exercised over Brown under well-established due process precedent because he lacks minimum contacts with this state.

Defendant Charles Brown, a federal firearm licensee, was authorized to sell handguns only in Ohio and only to Ohio residents, which he primarily accomplished through retail sales at gun shows held in various locations in Ohio. Brown did not maintain a website, had no retail store or business telephone listing, and did no advertising of any kind, except by posting a sign at his booth when participating in a gun show. In a series of transactions in 2000, Brown sold handguns to James Nigel Bostic and his associates. Prior to the transaction involving the gun at issue here, Brown consulted with the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) to ensure its legality. For each transaction, the necessary forms required by the ATF were properly completed and submitted, the purchaser passed the required Federal Bureau of Investigation (FBI) background check before the firearms were transferred, Brown verified that the purchaser had government-issued identification demonstrating Ohio residency, and notification of the purchases was timely sent to local law enforcement and the ATF as required by the federal Gun Control Act (see 18 USC § 922). During the transactions, Bostic indicated he was in the process of becoming a federal firearms licensee and was acquiring inventory for the eventual opening of a gun shop. Instead of opening a shop, Bostic brought the firearms to New York, illegally reselling one of the handguns to a Buffalo gang member. That gang member then used the handgun in a shooting that caused injury to plaintiff.

Plaintiffs commenced this personal injury action against, among others, Beemiller, Inc., an Ohio corporation and federally licensed firearms manufacturer, MKS Supply, Inc., an Ohio corporation and a federally licensed wholesale distributor of firearms, and Brown. Only Brown contested personal jurisdiction. Supreme Court, among other things, initially granted Brown's motion to dismiss the action (2011 NY Slip Op 34303 [U] [Sup Ct, Erie County 2011]) but the Appellate Division reversed, holding in relevant part that plaintiffs made a sufficient showing of personal jurisdiction to warrant further disclosure (100 AD3d 143 [4th Dept 2012]). After extensive discovery, Brown moved for summary judgment dismissing the complaint, again asserting a defense of lack of personal jurisdiction. Supreme Court denied the motion. The Appellate Division reversed, granted the motion for summary judgment, and dismissed the complaint as against Brown (159 AD3d 148 [4th Dept 2018]). Although the Appellate Division credited plaintiffs' argument that jurisdiction could be exercised under CPLR 302, New York's long-arm statute, it nonetheless reversed based on its conclusion that plaintiffs failed to establish the requisite minimum contacts under the due process clause. Plaintiffs appealed to this Court as of right on that substantial constitutional question and we now affirm.

When the defense is timely asserted, a New York court may not exercise personal jurisdiction over a non-domiciliary unless two requirements are satisfied: the action is permissible under the long-arm statute (CPLR 302) and the exercise of jurisdiction comports with due process (see LaMarca v Pak-Mor Mfg. Co., 95 NY2d 210, 214 [2000]). If either the statutory or constitutional prerequisite is lacking, the action may not proceed.

Due process requires that a nondomiciliary have "certain minimum contacts" with the forum and "that the maintenance of the suit does not offend traditional notions of fair play and substantial justice" (International Shoe Co. v Washington, 326 US 310, 316 [1945] [internal quotation marks and citations omitted]).  Thus, this constitutional mandate likewise encompasses two requirements and jurisdiction may not be exercised unless both are present.

With respect to due process, "[a] non-domiciliary tortfeasor has minimum contacts with the forum State . . . if it purposefully avails itself of the privilege of conducting activities within the forum State" (LaMarca, 95 NY2d at 216 [internal quotations marks and citations omitted]),"thus invoking the benefits and protections of [the forum state's] laws" (Hanson v Denckla, 357 US 235, 253 [1958]).  This test envisions something more than the "fortuitous circumstance" that a product sold in another state later makes its way into the forum jurisdiction through no marketing or other effort of defendant (World-Wide Volkswagen Corp. v Woodson, 444 US 286, 295 [1980]; see J. McIntyre Machinery, Ltd. v Nicastro, 564 US 873, 888-889 [2011] [Breyer, J., concurring]).  Put another way, "the mere likelihood that a product will find its way into the forum" cannot establish the requisite connection between defendant and the forum "such that [defendant] should reasonably anticipate being haled into court there" (World-Wide Volkswagen, 444 US at 297).

The constitutional inquiry "focuses on 'the relationship among the defendant, the forum, and the litigation'" (Keeton v Hustler Magazine, Inc., 465 US 770, 775 [1984],

quoting Shaffer v Heitner, 433 US 186, 204 [1977]). Significantly, "it is the defendant's conduct that must form the necessary connection with the forum State that is the basis for its jurisdiction" (Walden v Fiore, 571 US 277, 285 [2014]). Thus, the United States Supreme Court has "upheld the assertion of jurisdiction over defendants who have purposefully 'reach[ed] out beyond' their State and into another" (Walden, 571 at 285; see e.g. Burger King Corp. v Rudzewicz, 471 US 462, 480 [1985]), while clarifying that the relationship between defendant and the forum state must arise out of defendant's own contacts with the forum and not "contacts between the plaintiff (or third parties) and the forum State" (Walden, 571 at 284, citing Helicopteros Nacionales de Colombia, S. A. v Hall, 466 US 408, 417 [1984]; Hanson, 357 US at 253-254; World-Wide Volkswagen, 444 US at 298).

In Walden, the United States Supreme Court held that jurisdiction was not properly exercised where a defendant committed allegedly tortious conduct in Georgia against Nevada residents, despite knowing that the conduct would continue to affect them after their return to Nevada. The Supreme Court explained that, "when viewed through the proper lens—whether the defendant's actions connect him to the forum—[defendant] formed no jurisdictionally relevant contacts with Nevada," because the defendant "never traveled to, conducted activities within, contacted anyone in, or sent anything or anyone to Nevada" (Walden, 571 US at 289 [emphasis omitted]). Ultimately, "[d]ue process requires that a defendant be haled into court in a forum State based on [defendant's] own affiliation with the State, not based on the 'random, fortuitous, or attenuated' contacts [defendant]

makes by interacting with other persons affiliated with the State" (Walden, 571 US at 286, quoting Burger King, 471 US at 475; see Siegel, NY Prac § 88 [6th ed] [observing that the Supreme Court has "tighten[ed] . . . the reins on the application of longarm jurisdiction"]).

Here, viewing the facts in the light most favorable to plaintiffs, we agree with the Appellate Division that the requisite showing of minimum contacts with New York is lacking. In asserting jurisdiction, plaintiffs rely on the fact that firearms sold by Brown in Ohio eventually reached New York and claim that Brown should have had a reasonable expectation that this would happen based on conversations in which Bostic said he planned to open a shop in Ohio and "wouldn't mind having a shop in Buffalo." We agree with the Appellate Division that this evidence falls short of demonstrating purposeful availment. The facts of this case stand in contrast to those in LaMarca, wherein jurisdiction was properly exercised over a defendant that, in addition to advertising nationwide, initiated a business relationship with a New York-based distributor in order to sell products in New York (95 NY2d at 218). We distinguished that scenario from one where "defendant's connection with the forum State resulted from decisions made by others" (id. at 217). The latter is what occurred here.

Brown was not a member of the criminal gun trafficking conspiracy[1] and had no distribution agreement with Bostic and his associates, who purchased guns in separate

_____

[1] To the extent that plaintiffs rely on the theory that Brown knew Bostic was not a legitimate gun dealer and instead intended to sell guns illegally, the only basis in the record to conclude that Brown had any knowledge of Bostic's ties to New York were Bostic's statements that he was from Buffalo and "was planning on possibly" opening a gun shop there. Even assuming Brown possessed such a belief, knowledge that goods might end up

transactions. Brown offered uncontradicted evidence that Bostic, who resided in a neighboring Ohio town, represented to Brown that he had applied for an FFL – a license that would, once acquired, permit him (like Brown) to sell handguns only in Ohio to Ohio residents. Despite Bostic's stated aspiration to open a gun shop in Buffalo, the record is devoid of evidence supporting plaintiffs' theory that, merely by selling handguns to Bostic, Brown intended to serve the New York market. Even if Bostic indicated that there was a chance that he may – at some undefined point in the future – transport the firearms to New York, Brown cannot be said to have "forged [constitutionally sufficient] ties with New York" as there is no evidence that he "took purposeful action, motivated by the entirely understandable wish to sell [his] products here" such that he availed himself "of the privilege of conducting activities within" New York (LaMarca, 95 NY2d at 216-217 [internal quotation marks and citations omitted]; see Walden, 571 US at 286). In the absence of minimum contacts, New York courts may not exercise personal jurisdiction over Brown.[2] Plaintiffs' alternative alter ego theory of jurisdiction is also unavailing.

---

in New York is not the equivalent of purposeful availment. Moreover, the record shows that Brown consulted the ATF prior to making the sales in question – conduct hardly consistent with the theory that Brown and Bostic had entered into an illicit distribution arrangement to sell guns on the New York black market. Although on a motion for summary judgment we must view the facts in the light most favorable to the non-moving party, this does not permit us to alter or distort the facts or draw inferences not reasonably supported by the record.

[2] Because we agree with the Appellate Division's constitutional analysis, we do not address Brown's contention, as an alternative ground for affirmance, that the Appellate Division erred in crediting plaintiffs' interpretation of CPLR 302. Even assuming that jurisdiction could be exercised under the statute, the constitutional deficiency precludes the action from proceeding against Brown in New York.

Plaintiffs appropriately condemn the scourge of illegal gun trafficking affecting our state and others, which takes an enormous toll on injured parties and their communities. However, notwithstanding the sympathetic facts in this case, we must neutrally apply the well-established precedent of this Court and the United States Supreme Court, which precludes this action from proceeding against Brown in New York, while leaving claims against the manufacturer and distributor pending.

Accordingly, the order of the Appellate Division should be affirmed, with costs.

Williams et al. v Beemiller, Inc. & c., et al.

No. 25

FEINMAN, J. (concurring):

Defendant Charles Brown, a local Ohio firearms retailer, "did not maintain a website [in New York], had no retail store or business telephone listing [in New York], and did no advertising of any kind" in New York (majority op at 2 [DiFiore, Ch. J.]). The only

- 1 -

tenuous connection Brown had to this State was the sale of firearms in Ohio to another Ohio resident who indicated that there was "a chance . . . at some undefined point in the future" that those firearms might be "transport[ed] . . . to New York" (id. at 7). I agree with our colleagues (see id. at 1-2) and the Appellate Division that exercising personal jurisdiction over defendant Charles Brown, an Ohio resident, would violate his federal due process rights. I write separately to express that in my view, Brown's "connection" with this State, to the extent it could be characterized as a connection at all, is insufficient to establish personal jurisdiction in the first instance under our State's long-arm statute (see generally McGowan v Smith, 52 NY2d 268, 274 [1981]).

I.

Defendant Beemiller, Inc. ("Beemiller"), an Ohio corporation, manufactures 9 mm pistols. Those pistols are sold under the "Hi-Point" brand through an exclusive distributor, defendant MKS Supply, Inc. ("MKS"), another Ohio corporation. Brown, a federal firearms licensee, purchased some of these Hi-Point pistols from MKS Supply and re-sold them in Ohio through his company Great Lakes Products ("GLP"). From May to October 2000, at various gun shows in Ohio, Brown sold 182 handguns to Bostic and his two associates, all Ohio residents. During this time, Bostic told Brown that he and his associates were buying the firearms because they were "*planning on possibly* opening up a couple gun shops in the future, *possibly* two, one in Columbus, Ohio, one in Buffalo[, New York]" (emphases supplied). Instead, following each Ohio purchase, Bostic would take possession of the firearms, drive the firearms across state lines to Buffalo, New York,

and store them at his relatives' homes until he could sell the firearms directly to buyers or hand off the guns to third-parties for resale.

In August 2003, plaintiff Daniel Williams was shot in Buffalo, New York with one of the guns sold by Brown to Bostic and his associates. Two months after that shooting, Bostic pled guilty to illegally trafficking and sale of weapons in New York. This lawsuit, brought by Williams and his father, followed in July 2005.

Plaintiffs seek to hold defendants Beemiller, MKS, and Brown, among others, liable for the negligent sale and distribution of the firearm used in the shooting. The sole issue on this appeal is whether New York can exercise personal jurisdiction over Brown in this civil suit to recover damages for the injuries sustained by plaintiff.[1] The Appellate Division held that, although personal jurisdiction could be obtained over Brown under this State's long-arm statute, doing so would violate Brown's federal due process rights. Plaintiffs appealed to this Court as of right (see CPLR 5601 [b] [1]).

II.

"To determine whether a non-domiciliary may be sued in New York, we first determine whether our long-arm statute (CPLR 302) confers jurisdiction over it in light of its contacts with this State" (LaMarca v Pak-Mor Mfg. Co., 95 NY2d 210, 214 [2000] [emphasis added]). If the requirements of CPLR 302 are not met, our inquiry ends (see Vincent C. Alexander, Practice Commentaries, McKinney's Cons Laws of NY, CPLR

---

[1] Neither defendant MKS or Beemiller contested jurisdiction under New York's long-arm statute; the action against those defendants is still pending.

302:11).  However, if personal jurisdiction can be established under the statute, we must

ensure that it would not violate the non-domiciliary's federal due process rights (see

LaMarca, 95 NY2d at 214; Vincent C. Alexander, Practice Commentaries, McKinney's

Cons Laws of NY, CPLR 302:11).[2]

As relevant to this appeal, New York's long-arm statute provides that a court may

exercise personal jurisdiction over any non-domiciliary, who in person or through an agent:

> "3. commits a tortious act without the state causing injury to person or property within the state . . . if [the non-domiciliary]
>
> (i) regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or
>
> (ii) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce . . ." (CPLR 302 [a] [3] [i], [ii]).

Neither party disputes that plaintiffs established certain conditions precedent to jurisdiction

under CPLR 302 (a) (3) of New York's long-arm statute—that plaintiffs' underlying causes

of action arise from Brown's tortious acts without the State (Brown's allegedly negligent

sale to Bostic in Ohio), which eventually caused injury within the state (the shooting of

plaintiff Daniel Williams in Buffalo, New York).  Our inquiry is therefore focused on

whether Brown is entitled to summary judgment, dismissing the action, on the basis that

---

[2] Although I would dispose of this appeal under our state's long-arm statute, five of my colleagues reach federal due process to resolve the case.  Because I agree that exercising personal jurisdiction over Brown would also violate his federal due process rights, I concur in the majority's due process analysis.

New York cannot exercise long-arm jurisdiction over him under either subparagraph (i) or (ii) of (a) (3) (see CPLR 3212 [b]; Jacobsen v New York City Health & Hosps. Corp., 22 NY3d 824, 833 [2014]).

### III.

CPLR 302 (a) (3) was enacted in 1966 after this Court's decision in Feathers v McLucas, which held that non-residents could not be subjected to jurisdiction under our long-arm statute for an "out-of-state tortious act" (15 NY2d 443, 460 [1965]; Mem in Support, L 1966, ch 590 at 17-18).[3] In Feathers, we noted that "[a]ny plea for further expansion of [the long-arm statute's] scope . . . is a matter for the Legislature rather than the courts" (id. at 464). To aid the legislature in amending the long-arm statute, a study was conducted by the Judicial Conference on the necessary revisions to CPLR 302 (11th Ann Report of NY Jud Conf, at 132-139; 12th Ann Report of NY Jud Conf, at 339-344). The new provision was designed to be "well within constitutional bounds" (12th Ann Report of NY Jud Conf, at 341 [emphasis added]), and subparagraphs (i) and (ii) of CPLR 302 (a) (3) "were deliberately inserted" to achieve that goal (Ingraham v Carroll, 90 NY2d

---

[3] In Feathers, this Court highlighted the "reformulated" standard of personal jurisdiction ushered in by the Supreme Court's decisions International Shoe Co. v State of Wash. and Hanson v Denckla: "'The unilateral activity of those who claim some relationship with a nonresident defendant', the court concluded, 'cannot satisfy the requirement of contact with the forum State . . . . [I]t is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws'" (Feathers, 15 NY2d at 451-452 [emphasis added], quoting International Shoe, 326 US 310, 316 [1945]; Denckla, 357 US 235, 253 [1958]).

592, 596-597 [1997]).  Hence, "[t]he purpose of sub[paragraphs] (i) and (ii) is to ensure the fairness of asserting jurisdiction over nondomiciliaries whose out of state acts cause local injuries" (Vincent C. Alexander, Practice Commentaries, McKinney's Cons Laws of NY, 302:3).

Our rules of construction reinforce the underlying intent of CPLR 302 (a) (3).  As a general matter, "courts must avoid, if possible, interpreting a presumptively valid statute in a way that will needlessly render it unconstitutional" (Overstock.com, Inc v New York State Dep't of Taxation & Fin., 20 NY3d 586, 593 [2013]).   In line with this general rule, when our long-arm statute is interpreted, whether federal due process may be offended should be considered to "avoid grave doubts concerning [the statute's] constitutionality" (Fantis Foods v Standard Importing Co., 49 NY2d 317, 327 [1980]; see also Vincent C Alexander, Practice Commentaries, McKinney's Cons Laws of NY, CPLR 302:11).  This interpretive framework, coupled with the intentional legislative design, ensures that it will be the "rare" case where the long-arm statute is out of step with federal due process (D&R Global Selections, S.L. v Bodega Olegario Falcon Pineiro, 29 NY3d 292, 300 [2017] [internal quotation marks omitted]).

IV.

In this case, both the dissenters and the Appellate Division agree that the requirements of CPLR (a) (3) (i) were met because Brown derived substantial revenue from goods used or consumed in this state (see dissenting op at 9; 159 AD3d 148, 154 [4th Dept 2018]).  To support this holding, the dissent, as did the Appellate Division, limits its

analysis to a calculation of the revenue generated by Brown from his Ohio sales to Bostic and his associates. The dissent concludes that regardless of whether one examines the proportion of Brown's sales (roughly one-third of his sales for the relevant period) or the total dollar value of his sales, "the result is the same"—subparagraph (i) is satisfied (dissenting op at 9). The dissent's calculation of Brown's Ohio sales to other Ohio residents *ipso facto* includes no sales by him to New York residents or the New York market. This application of the statute is inconsistent with the legislative intent, the structure of the statute, and its prior application.

As this Court has made clear, "CPLR 302 (a) (3) (i) necessitates some *ongoing activity within New York State*" (Ingraham, 90 NY2d at 597 [some emphasis supplied]). This approach is grounded in the plain text of the statute. The first three clauses in CPLR 302 (a) (3) (i) allow for jurisdiction when the defendant "regularly [1] does or [2] solicits business or [3] engages in any other persistent course of conduct" in the State. These clauses address whether defendants have, of their own volition, engaged in regular or persistent activity in New York such that they have established sufficient contacts with this State (see 12th Ann Report of NY Jud Conf at 343; Vincent C. Alexander, Practice Commentaries, McKinney's Cons Laws of NY, CPLR 302:12). Thus, for example, courts have found that a "long-term apartment rental" by a business in New York can "constitute a persistent course of conduct by the firm" (Bank Brussels Lambert v Fiddler Gonzalez & Rodriguez, 305 F3d 120, 126 [2d Cir 2002]). Personal engagement in business transactions in New York also regularly meets the requirements of the first three clauses of CPLR 302

(a) (3) (i) (see e.g. Granada Television, International, LTD., v Lorindy Pictures International, Inc., 606 F Supp 68, 72 [SDNY 1984] [finding participation in "at least two New York real estate partnerships," ownership of land, and maintenance of bank account in New York met the statutory requirements of CPLR 302 (a) (3) (i)]).

The last clause of CPLR 302 (a) (3) (i)—the substantial revenue clause—is no different in its requirement of contacts between a non-domiciliary and New York. But rather than assessing a non-domiciliary's regular activity in New York, it focuses on the value of a non-domiciliary's commercial contacts with the State (see Allen v Canadian Gen. Elec Co, 65 AD2d 39, 41 [3d Dept 1978], affd 50 NY2d 935 [1980] [substantial revenue clause of CPLR 302 (a) (3) (i) involves calculating "(t)he importance of New York revenues to the total revenues of a business not actually doing business in New York State"]). Accordingly, it is the commercial importance to the non-domiciliary of their sales—measured by either "comparing the [non-domiciliary's] overall income with its New York portion" or examining the sheer numerical value of New York income—that is the touchstone (Siegel & Connors, NY Prac § 88 [6th ed]).

This difference in focus does not mean, however, that the volitional requirement that the non-resident engage in some "ongoing activity" within the State disappears under the substantial revenue clause (see Ingraham, 90 NY2d at 597). Unlike the dissent's approach here, courts applying that clause have understood as much. Jurisdiction under the substantial revenue clause has been tied to purposeful activity by the defendant in New York, usually direct sales by the defendant to New York-based customers or usage of New

York distributors (see Reynolds v Aircraft Leasing, Inc., 194 Misc 2d 550, 552 [Sup Ct, Queens County 2002]; Tonns v Spiegel's, 90 AD2d 548, 549 [2d Dept 1982]; Allen, 65 AD2d at 41). Where those intentional relationships are absent, courts have been hesitant to exercise jurisdiction over a non-domiciliary under the substantial revenue clause— especially when the non-domiciliary's goods are used or consumed in New York due to the unilateral activity of third parties (see e.g. Stephan v Babysport, LLC, 499 F Supp 2d 279, 289 [EDNY 2007] [declining to "attribute[] to Defendants" sales made in New York by "an unrelated entity in the final chain of distribution"]).

The dissent's jurisdictional analysis under the substantial revenue clause omits the requirement of "sufficient contacts with this state" that is essential to the exercise of personal jurisdiction under any of the clauses of CPLR 302 (a) (3) (i) (see Ingraham, 90 NY2d at 597 [internal quotation marks omitted]). Each clause constitutes a "'plus factor'" that "serve[s] to filter out cases in which the inforum impact is an isolated event and the defendant otherwise has no, or scant, affiliations with the forum" (Crane v Carr, 814 F2d 758, 763 [DC Cir 1987] [Ginsburg, J.] [analyzing D.C. long-arm statute that contains identical language to CPLR 302 (a) (3) (i)]). Indeed, "each of the four alternative contacts in subset (i) constitutes a regular course of conduct in the state" (Vincent C. Alexander, Practice Commentaries, McKinney's Cons Laws of NY, C302:12; see 12th Ann Report of NY Jud Conf, at 343). Reading "sufficient contacts" out of the substantial revenue clause and finding that a non-resident's sales in another state constitute deriving revenue from

New York State solely because their goods were later—sometimes years later—used or consumed in this State is entirely inconsistent with the legislative design of the statute.

In short, text, precedent, and legislative intent all compel the conclusion that the substantial revenue clause of CPLR 302 (a) (3) (i) requires evidence that the non-domiciliary not just derive revenue from New York State, but *intend* to derive revenue from this State.[4] There is no evidence that Brown intended to derive such revenue here. Brown never contracted to provide services within New York, nor advertised or solicited business in New York, nor sent representatives or agents into New York, nor enticed New York residents or firearm distributors to come to Ohio to purchase firearms from him (see e.g. Ingraham, 90 NY2d at 598 [declining to exercise jurisdiction pursuant to CPLR 302 (a) (3) (i) because "it is undisputed that respondent practices only in Vermont . . . . [h]e neither treated decedent in New York, nor contracted to provide services in New York or solicited business in New York"]).[5] To be sure, *Bostic's* illicit gun trafficking from Ohio and subsequent sales in New York constitute a regular course of conduct within New York, such that *Bostic* could be said to have derived substantial revenue from this State. However, his nebulous remarks to Brown, that he was "planning on possibly opening" or

---

[4] The dissent does not dispute that intent or knowledge is necessary to show an "association between the defendant and this forum" (dissenting op at 10).

[5] In fact, it was only in 2004 that Brown made a single two-gun sale to a New York State resident, a transaction that by itself, is insufficient to establish that Brown engaged in a regular course of conduct within New York State (see 12th Ann Report of NY Jud Conf, at 341 ["a (singular) business transaction is insufficient and a regular course of conduct in the state is required"]; see also Ingraham, 90 NY2d at 597).

"wouldn't mind having" a store in New York at some unspecified point in the future, are not enough to attribute this regular course of conduct to Brown (see e.g. Birmingham Fire Ins. Co. of Pennsylvania v KOA Fire & Marine Ins. Co., 572 F Supp 962, 968 [SDNY 1983]). To exercise long-arm jurisdiction over Brown based only on his Ohio sales to Bostic and his associates, all Ohio residents, would contravene the emphasis placed on fairness to the non-domiciliary when subparagraph (i) was crafted (see 12th Ann Report of NY Jud Conf, at 341 [subparagraph (i) is meant to cover "those non-domiciliaries who have sufficient contacts with this state so that it is not unfair to require them to answer in this state for injuries they cause here by acts done"] [emphasis added]).  Put simply, Brown does not have sufficient contacts with this State to make it reasonable to subject him to jurisdiction under the substantial revenue clause of CPLR 302 (a) (3) (i) (see Siegel & Connors, NY Prac § 88 [6th ed]).

Jurisdiction is similarly lacking under CPLR 302 (a) (3) (ii).  To find jurisdiction under this subparagraph, a plaintiff must demonstrate that the nondomiciliary "expects or should reasonably expect the act to have consequences in the state *and* derives substantial revenue from interstate or international commerce" (CPLR 302 [a] [3] [ii] [emphasis supplied]).  The dissent posits that because Brown sold firearms to Bostic and was told by Bostic that he and his associates might open a store in Buffalo, "Brown served the New York market" (dissenting op at 15).  In doing so, the dissent disregards the same principles it did when analyzing subparagraph (i) of CPLR 302 (a) (3).

The first clause of subparagraph (ii)—the foreseeability clause—"is intended to ensure some link between a defendant and New York State to make it reasonable to require a defendant to come to New York to answer for tortious conduct committed elsewhere" (Ingraham, 90 NY2d at 598). The second clause—the interstate commerce clause—"is designed to narrow 'the long-arm reach to preclude the exercise of jurisdiction over nondomiciliaries who might cause direct, foreseeable injury within the State but whose business operations are of a local character'" (LaMarca, 95 NY2d at 215 [some internal quotation marks omitted] [emphasis added], quoting Ingraham, 90 NY2d at 599; see 12th Ann Report of Jud Conf, at 342-343).

The key to meeting the first condition is assessing whether the non-domiciliary "knew that [a product] was likely to end up in New York" (Siegel & Connors, NY Prac § 88). It follows that there must be some "discernible effort [by the non-domiciliary] to directly or indirectly serve the New York market" (Schaadt v TW Kutter, Inc., 169 AD2d 969, 969 [3d Dept 1991]). Here, there is no way to discern any such effort. This is not a case where Brown should have "foreseen the forum consequences . . . because he entered into agreements with agents to solicit business in New York" (Allen v Auto Specialties Mfg. Co., 45 AD2d 331, 333 [3d Dept 1974]) or engaged with a "New York distributor" (LaMarca v Pak-Mor Mfg. Co., 95 NY2d 210, 215 [2000]). In Bostic's conversations with Brown, the former simply relayed his speculative aspirations: that he "plann[ed] on possibly" opening up a store in Buffalo, New York. These false claims to Brown fail to show that Brown "knew that [his products were] likely to end up in New York" (Siegel &

Connors NY Prac § 88 [6th Ed]; see e.g. Martinez v American Standard, 91 AD2d 652, 653 [2d Dept 1982], affd 60 NY2d 873 [1983] [rejecting jurisdiction under CPLR 302 (a) (3) (ii) where the defendant "d(id) not advertise or solicit business in New York . . . and d(id) not ship any of its products into New York"]).

The second interstate revenue condition of subparagraph (ii) permits the exercise of jurisdiction over non-domiciliaries that "can reasonably foresee that [their] business may subject [them] to the jurisdiction of the various states from which [they] derive[] revenue" (Mem by the Committee on Civil Practice Law and Rules, Bill Jacket, L 1966, ch 590 at 9 [emphasis added]).  This "limitation . . .  is intended to exclude non-domiciliaries whose business operations are of a local character" (12th Ann Report of NY Jud Conf, at 341).

Here, Brown's business was decidedly local.  GLP is an Ohio *retail* firearms store, through which Brown, pursuant to his FFL, has only sold handguns to in-state residents (compare LaMarca, 95 NY2d at 215 [stating that "Pak-Mor's business can hardly be characterized as 'local' . . . . (a) Texas corporation with a manufacturing facility in Virginia is inherently engaged in interstate commerce . . . . (m)oreover, the company had a New York distributor and a district representative"]).[6]  In the year 2000, when the firearm sales at issue were made to Bostic, Brown sold only 9 out of 525 firearms to out-of-state

---

[6] In accordance with his federal firearms license, Brown operated a retail firearm store out of his home and sold firearms, within certain parameters, at qualifying gun shows around Ohio:  Brown was allowed to sell handguns and long guns (rifles and shotguns) to other Ohio residents, long guns to out-of-state residents, handguns and long guns to licensed out-of-state gun dealers, and handguns and long guns to law enforcement agencies (see 18 USC § 922 [b] [3]; 27 CFR §§ 478.50, 478.94, 478.96, 478.99, 478.100).

residents, accounting for less than 2% of his total sales. Such small percentages of total revenue, which Brown stated was in the thousands of dollars per year, have only been categorized as substantial when the dollar amount has been considerably greater (see Allen v Canadian General Elec. Co. Ltd., 65 AD2d 39, 42 [3d Dept 1978] [holding that while "ordinarily it would not be expected that a small percentage of 1% or 2% would equal large amounts of money", jurisdiction under the long-arm statute was warranted where 1% of sales generated nine million dollars], affd 50 NY2d 935 [1980]; compare Ingraham, 90 NY2d at 604, citing New England Laminates Co. v Murphy, 79 Misc 2d 1025, 1028 [Sup Ct, Nassau County 1974] [4% of $400,000 not "substantial" as a matter of law]).

In sum, in the year he sold firearms to Bostic, Brown did not engage in interstate activity from which he derived substantial revenue, let alone interstate activity from which he derived revenue from New York State.[7] To find then that plaintiff satisfied the requirements of CPLR (a) (3) (ii) on "so attenuated a consequence of defendant's act" would "burden unfairly non-residents whose connection to the state is remote" (Fantis, 49 NY2d at 327; see 11th Ann Report of NY Jud Conf at 136 [stating that "(i)f the (non-domiciliary) had no other contact with New York, it might be thought both unfair and undesirable to subject him to the jurisdiction of New York"]).

---

[7] The dissent's attempt to include Brown's sales to Bostic in its calculation of interstate revenue for purposes of exercising jurisdiction under subparagraph (ii) fails for the same reasons it failed under the analysis in subparagraph (i)—Bostic's New York sales cannot be attributed to Brown (see supra at 10-11).

Plaintiffs have failed to raise a question of fact as to whether personal jurisdiction over Brown can be exercised under this State's long-arm statute.

Even assuming personal jurisdiction under the statute, I agree with the majority opinion that such jurisdiction would violate Brown's federal due process rights.

Williams v Beemiller, Inc. & c., et al.

No. 25

FAHEY, J. (dissenting):

It is impossible for any court to apply the rule of law if the simple facts are ignored. Here the undisputed facts establish that defendant Charles Brown, on multiple occasions, sold firearms in Ohio to defendant non-domiciliary James Nigel Bostic, a gun trafficker

who Brown knew "planned to open a store . . . in Buffalo" and who did indeed sell guns – albeit illegally – in that city.

The Appellate Division concluded that, in spite of his knowledge of Bostic's intentions to remarket those weapons in Buffalo, courts of this state cannot exercise personal jurisdiction over Brown in an action seeking damages for personal injuries sustained as a result of Brown's allegedly negligent sale of those weapons. Any objective review of the unvarnished facts would require reversal of that order.

The majority reaches the opposite conclusion. We respectfully disagree. The law and the facts support jurisdiction over Brown, demand reversal of the Appellate Division order, and compel our dissent.

I.

Daniel Williams (plaintiff) was shot in a case of mistaken identity while he played basketball in front of a neighbor's house in Buffalo in August 2003. The bullet that struck plaintiff entered his stomach, and closing the wound required 22 stitches. Plaintiff, a promising student, could barely walk when he was released from the hospital, and those injuries sidelined a basketball career that included plaintiff's consideration as an NCAA Division I prospect.

The gun used in that shooting was manufactured by defendant Beemiller, Inc. (Beemiller), which was doing business as Hi-Point and which was both an Ohio corporation and licensed by the federal government to manufacture the weapon in question. Beemiller sold that gun to defendant MKS Supply, Inc. (MKS), which in turn sold it to Great Lakes Products (Great Lakes). That latter entity was owned and operated by Brown.

For his part, Brown sold that gun and other firearms at gun shows in Ohio in and around 2000. The gun in question was one of 182 such weapons Brown sold to Bostic and defendant Kimberly Upshaw[1] at such shows in 2000. All of those purchases were cash transactions, and all of the guns obtained from Brown in Ohio were transported to and sold illegally in Buffalo. One of those weapons–which was part of an 85-gun bulk sale--made its way to defendant Cornell Caldwell, who used it to shoot plaintiff.

From those facts and allegations arose three sets of charges. Caldwell pleaded guilty to assault in the second degree – a class C violent felony – based on his participation in the incident in which plaintiff was shot. Bostic, in turn, pleaded guilty to federal trafficking crimes based on his participation in the scheme through which Caldwell obtained the gun that he used to shoot plaintiff (see 18 USC § 922 [a] [1] [A] [unlawfully dealing in firearms and, in the course thereof, unlawfully transporting the firearms in interstate commerce]; 18 USC § 922 [a] [5] [unlawfully transferring firearms to individuals who were residing in a state other than that in which the defendant was residing]). Most importantly for the purposes of this appeal, plaintiff and his father, plaintiff Edward Williams, commenced this action seeking justice with respect to the significant, life-altering personal injuries that plaintiff suffered in the shooting.

In lieu of answering, Brown moved to dismiss the first amended complaint as against him on grounds including lack of personal jurisdiction. That issue was litigated in the lower courts; one motion court initially concluded that the operative complaint as

---

[1]     DiAnna Peterson, who is not a defendant, is another Bostic associate who purchased guns from Brown for Bostic.

against Brown should be dismissed for lack of personal jurisdiction (2011 NY Slip Op 34303[U] [Supreme Court, Erie County (Marshall, J.)]), but the Appellate Division reversed that order and directed discovery on the issue of personal jurisdiction (100 AD3d 143 [4th Dept 2012], amended on rearg 103 AD3d 1191 [4th Dept 2013]).

Following jurisdictional discovery, Brown moved for summary judgment dismissing the operative complaint as against him on the ground that courts of this state lack personal jurisdiction over him. A different motion court (Supreme Court, Erie County [Devlin, J.]) denied that second motion for accelerated judgment, ruling that the evidence adduced during jurisdictional discovery reflected that Brown "had some knowledge that [the subject guns] would end up in New York" based on, among other things, Bostic's "statement to Brown that Bostic and Upshaw planned to open a store [selling those guns] in Ohio and . . . in Buffalo."

On appeal, however, the Appellate Division reversed Supreme Court's order and dismissed the operative complaint as against Brown (159 AD3d 148 [4th Dept 2018]). After acknowledging the relevant facts, namely, that

- Brown sold 182 of the guns in question "to Bostic and his associates between May and October 2000" (id. at 154);

- Those guns were "used and consumed," that is, they were possessed and fired, in New York State (id. [internal quotation marks omitted]);

- The sale of those 182 guns "to Bostic and his associates constituted approximately 34% of Brown's gun sales by volume in 2000" (id.) and 4.4% of his sales for the period from 1996 to 2005 (see id.);

- Those guns were sold at a discounted rate of $85 per unit (see id.);

- Brown attended various trade "shows along the 'I-75 corridor,' which was accessible to buyers from states in the region such as Indiana and Kentucky" (id.);

- Not including the guns sold to Bostic and his associates, "Brown sold and transferred 404 guns to out-of-state purchasers" for the period from 1996 to 2005," and "[s]uch interstate transactions constitute[d] over 9.8% of Brown's total sales by volume for that period" (id. at 155); and

- Brown's percentage of sales of such guns "would be 14.3% if the Bostic sales were included as out-of-state sales" (id.),

the Appellate Division concluded that the requirements of New York's long-arm statute (CPLR 302) had been met (see 159 AD3d at 152-156, discussing CPLR 302 [a] [3] [i]). Nevertheless, in spite of our repeated instruction that personal jurisdiction under the long-arm statute violates federal due process only in the rarest of cases (see D&R Glob. Selections, S.L. v Bodega Olegario Faclon Pineiro, 29 NY3d 292, 299-300 [2017]; Rushaid v Picet & Cie, 28 NY3d 316, 330 [2016], rearg denied 28 NY3d 1161 [2017]; see also Licci ex rel Licci v Lebanese Can. Bank, SAL, 732 F3d 161, 170 [2d Cir 2013]), the Appellate Division "agree[d] with Brown that principles of federal due process preclude New York from exercising personal jurisdiction over him" (159 AD3d at 156). Plaintiffs appeal as of right to this Court (see CPLR 5601 [b] [1]).

II.

Under our settled case law, assessing whether a non-domiciliary is subject to personal jurisdiction in New York is a two-step inquiry. First, we must "determine whether our long-arm statute (CPLR 302) confers jurisdiction over [the defendant] in light of [the

defendant's] contacts with this State" (LaMarca v Pak-Mor Mfg. Co., 95 NY2d 210, 214 [2000]). "If the defendant's relationship with New York falls within the terms of CPLR 302," then we proceed to the second step of "determin[ing] whether the exercise of jurisdiction comports with due process" (LaMarca, 95 NY2d at 214). The majority elects to decide the constitutional question without any consideration of whether the long-arm statute reaches Brown. Doing so contravenes our well-established precedent, including precedents on which the majority itself relies, all of which hold that we must resolve statutory arguments (including statutory interpretation that considers constitutional avoidance) before holding a statute unconstitutional as applied (see id. at 214 ["(t)o determine whether a non-domiciliary may be sued in New York, we *first* determine whether our long-arm statute (CPLR 302) confers jurisdiction over it in light of its contacts with this State"] [emphasis added]; Ingraham v Carroll, 90 NY2d 592, 600 [1997] [ending inquiry after CPLR 302 (a) (3) analysis because New York could not exercise long-arm jurisdiction over non-domiciliary]; see generally McKinney's Cons Laws of NY, Book 1, Statutes § 150[a] [collecting cases]). The rule, established at least since 1833 by the United States Supreme Court (Ex parte Randolph, 20 F Cas 242 [CCD Va 1833] [Marshall, C.J.]) and adopted by this Court shortly thereafter (People ex rel. Wetmore v New York County Sup'rs, 34 How Pr 379, 379 [Ct App 1865]), that "if a case can be decided on either of two grounds, one involving a constitutional question, the other a question of statutory construction or general law, the Court will decide only the latter" (Ashwander v Tennessee Valley Auth., 297 US 288, 347 [1936] [Brandeis, J., concurring]) is foundational to the proper understanding of the judicial power—namely one that avoids placing matters

entirely beyond the competence of the elected branches by handing down unnecessary constitutional rulings.[2]

We doubt the majority intends silently to overrule the "hornbook law that a court will not pass upon a constitutional question if the case can be disposed of in any other way" (People v Felix, 58 NY2d 156, 161 [1983]).  In any event, there remains the long-standing principle that we interpret statutory provisions before reaching constitutional questions (see McBarnette v Sobol, 83 NY2d 333, 337 [1994]).  If our state courts' exercise of personal jurisdiction over Brown does not meet the requirements of CPLR 302 (as the judges who concur with the majority conclude), then there is no occasion to engage in the due process analysis (in which the majority engages, and which the judges who concur with the majority gratuitously join).  Either way, the majority and concurring opinions violate fundamental rules of judicial review.[3]

_____

[2]    To the extent the majority suggests that we need not address CPLR 302(a) first because Brown appealed as of right pursuant to CPLR 5601 (b) (1) (see majority op at 3, 7 n 2), we respectfully disagree.  This Court is not limited to reviewing Brown's constitutional arguments merely because he appealed under CPLR 5601(b)(1), and this provision contains nothing to support the majority's departure from centuries of legal principle (see Arthur Karger, Powers of the NY Court of Appeals [2d ed] § 7:2 [discussing CPLR 5601 (b) (1) and explaining "so long as such a constitutional question is directly involved, an appeal as of right will lie even though other questions may also be involved, and all questions in the case which the Court of Appeals is empowered to review will be open for consideration, whether or not they are of a constitutional nature"]).

[3]    As noted, and stated simply, courts are bound by what effectively is a rule of procedure providing that a statutory question (here, long-arm jurisdiction pursuant to CPLR 302) is to be decided before a constitutional question (in this case, whether the exercise of long-arm jurisdiction pursuant to CPLR 302 comports with federal constitutional due process requirements).  To the extent that rule is applied here, the judges in the majority who ignore the question of statutory long-arm jurisdiction arguably have conceded that there is jurisdiction pursuant to CPLR 302 (a) (3) as a predicate to their conclusion that this is one of the rarest of cases (see D&R Glob. Selections, S.L., 29 NY3d

We decline to repeat the majority's error and thus begin our analysis with New York's long-arm statute, CPLR 302, which is entitled "Personal jurisdiction by acts of non-domiciliaries."  Pursuant to the relevant parts of subdivision (a) of that statute,

> "A court may exercise personal jurisdiction over any non-domiciliary . . . who in person or through an agent: . . .
>
> "(3).  commits a tortious act without the state causing injury to person or property within the state, except as to a cause of action for defamation of character arising from the act, if [the non-domiciliary]
>
> "**(i)**     regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, **or**
>
> "**(ii)**     expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce" (emphases added).

The two branches of this test are disjunctive, meaning that a court may exercise personal jurisdiction over a non-domiciliary in the event that either all of the criteria in romanette (i) are met *or* the criteria in romanette (ii) are satisfied.  Viewed in the light most favorable to plaintiffs, as the nonmoving parties (<u>Vega v Restani Corp.</u>, 18 NY3d 499, 503 [2012]),[4] the evidence establishes that Brown is subject to personal jurisdiction under

---

at 299-300 [2017]; <u>Rushaid</u>, 28 NY3d at 330) in which statutory long-arm jurisdiction is prohibited under a federal due process analysis (<u>cf.</u> majority op at 1-2 ["agree(ing) with the Appellate Division that . . . jurisdiction cannot be exercised over Brown under well-established due process precedent because he lacks minimum contacts with this state"]).

[4]     The prism through which the evidence should be viewed – the light most favorable to plaintiffs, as the non-moving parties – is the lynchpin of our judicial inquiry, but reference to authority acknowledging that concept is inexplicably absent from both the majority and concurring opinions.

CPLR 302 (a) (3) – irrespective of which of that subdivision's romanettes our analysis proceeds.

A.

Turning first to CPLR 302 (a) (3) (i), there can be no dispute that the requirement that Brown knowingly derived substantial revenue from goods used or consumed in this state has been met. The analysis of this romanette turns on the meaning of the word "substantial," which has been subject to both a "proportion" test and a "quantity" test (see Siegel & Connors, NY Prac § 88, at 194 [6th ed 2018]).

Irrespective of whether the "proportion" test or the "quantity" test is employed here, the result is the same: Brown's merchandising led to the conclusion that he knowingly "derive[d] substantial revenue from goods used or consumed in [this state]," thereby satisfying the first romanette of CPLR 302 (a) (3). As noted, the record reflects, among other things, that Brown sold a significant number of guns to Bostic and Bostic's associates in 2000, that those guns were used and consumed in New York State, and that those sales constituted approximately one-third of Brown's total sales in that year.

In reaching a different result, the judges concurring with the majority conclude that plaintiffs' allegation that Brown derived "substantial revenue" from New York based on his Ohio sales to Bostic and Bostic's associates does not permit the exercise of long-arm jurisdiction over Brown because Brown also did not engage in a regular course of conduct within New York State (see concurring op at 7-8). That conclusion conflates what the legislature has said are to be separate analyses under romanette (i) of CPLR 302 (a) (3).

Specifically, the judges who concur with the majority imply that a single business transaction that yields "substantial revenue from goods used or consumed . . . in this state" (CPLR 302 [a] [3] [i]) does not permit the exercise of personal jurisdiction if that substantial revenue is not also the product of a "regular course of conduct in this state" (concurring op at 9 [internal quotation marks omitted]).  In CPLR 302 (a) (3), however, the legislature separated degree of revenue from constancy of conduct when it provided that a court may exercise personal jurisdiction over any non-domiciliary who, among other things, "engages in any . . . persistent course of conduct[] *or* derives substantial revenue from goods used . . . in th[is] state" (CPLR 302 [a] [3] [i] [emphasis added]).

Ingraham v Carroll (90 NY2d 592 [1997]) does not provide otherwise.  There, we considered the "regularly [doing] or solict[ing] business" clause of romanette (i) and concluded that, to satisfy such criterion, the party seeking to obtain jurisdiction must show "something more than the 'one shot' single business transaction described in CPLR 302 (a) (1)" (Ingraham, 90 NY2d at 597).  Here, by contrast, "substantial revenue" does not measure the *frequency* of contacts between a defendant and this state, but the *size* of even a single association between that defendant and this forum.  The fact that a defendant's conduct that generates "substantial revenue" is not continual, enduring, or repeated does not exempt that defendant from long-arm jurisdiction under CPLR 302 (a) (3) (i).  Rather, where sporadic use or consumption of goods in New York State yields "substantial revenue," the legislature has provided that the beneficiary of such revenue may be subject to statutory long-arm jurisdiction – even if the income-producing activity is not "regular[]"

or "persistent" (CPLR 302 [a] [3] [i]; <u>cf.</u> concurring op at 9).[5]  Here, because the parties do not dispute that the preliminary conditions precedent to a finding of jurisdiction (namely, a tort occurring outside the state causing injury to person or property inside the state) have been met, satisfaction of the "substantial revenue" factor alone is sufficient to establish long-arm jurisdiction pursuant to CPLR 302 (a) (3) (i).

B.

Whatever one's conclusion under romanette (i), the facts here easily satisfy the "interstate or international commerce" prong of romanette (ii).[6]  Under the latter romanette, personal jurisdiction may be exercised over a non-domiciliary when, among other things, such party (1) "expects or should reasonably expect the act to have consequences in the state"; and (2) "derives substantial revenue from interstate or international commerce" (CPLR 302 [a] [3] [ii]).  Both prongs are satisfied based on Brown's personal and active multiple sales of guns to Bostic intended for sale in New York.

---

[5]     At least one commentator has reached the same common sense conclusion.  The Practice Commentaries to CPLR 302 correctly recognize that to "derive[] substantial revenue from goods used or consumed . . . in the state" (CPLR 302 [a] [3] [i]) is to establish " 'sufficient contacts with this state so that it is not unfair to require [defendants] to answer [here] for injuries they cause here by acts done elsewhere' " (Vincent C. Alexander, Practice Commentaries, McKinney's Cons Laws of NY, C302:12, quoting 12th Ann Report of NY Jud Conf 339, 343 [1967]).

[6]     Although unnecessary given the determination that there should be jurisdiction under romanette (i), the analysis of romanette (ii) is relevant for the reason that it informs the federal due process inquiry to follow in section III of this writing.

With respect to the "interstate or international commerce" prong of this subparagraph, Brown's business cannot "be characterized as 'local' " (LaMarca, 95 NY2d at 215). By their nature and intent, gun shows attract out-of-state buyers (see Target on Trafficking: New York Gun Crime Analysis, Office of the New York State Attorney General, available at https://targettrafficking.ag.ny.gov/ [last accessed Apr. 16, 2019]), and Brown conducted business at shows held along Ohio's "I-75" corridor, which provides easy highway access to buyers from neighboring states including Indiana and Kentucky. Even if we exclude the guns sold to Bostic and the two straw purchasers in this case, approximately 10% of Brown's sales for the period from 1996 to 2005 were of an interstate nature. If we count the guns sold to Bostic and his cohorts, then nearly 15% of Brown's total sales during the subject period were to out-of-state buyers.

With respect to the "direct consequences" prong of romanette (ii), that element "is intended to ensure some link between a defendant and New York State to make it reasonable to require a defendant to come to New York to answer for tortious conduct elsewhere" (Ingraham, 90 NY2d at 598). That is, "[t]he nonresident tortfeasor must expect, or have reason to expect, that [its] tortious activity in another State will have direct consequences in New York" (id.).

It is hard to imagine that Brown did not "expect or should [have] reasonably expect[ed]" his sales to Bostic "to have consequences in this state" (CPLR 302 [a] [3] [ii]). Brown's commercial relationship with Bostic was not an isolated transaction. Over the course of six months, he sold a total of 182 handguns to Bostic and his associates on six different occasions.

Indeed, on October 8, 2000, Brown sold 85 Hi-Point handguns to Bostic and Upshaw, which Brown described as "the biggest sale" he had "ever made in ten years of owning a federal firearms license and 25 [years] of being in the business." To facilitate that transaction, Brown telephoned a contact at the federal Bureau of Alcohol, Tobacco, and Firearms (ATF) to confirm whether he was obligated to do anything out of the ordinary given the large, cash-only sale.

A review of the transactions in chronological order is enlightening. On May 27, 2000, according to Brown, Bostic told Brown's father-in-law that Bostic "was planning on possibly opening up a couple gun shops in the future, possibly two, one in Columbus, Ohio, and one in Buffalo. Brown met Bostic for the first time on June 24, 2000, and Brown stated that, during that meeting, Bostic "said his plans were to open up a shop in Columbus, Ohio, somewhere." At that meeting Bostic also "talked" to Brown "about being from Buffalo" and, in Brown's words, "wanting – you know, he said he wouldn't mind having a shop in Buffalo." In the same conversation, Bostic told Brown that Bostic "had been out to other retail stores and . . . was kind of looking around and seeing how they laid their stores out that type of thing." That meeting also saw Brown discuss with Bostic "a lot of different items with regard to a retail store opening," including "how many guns [Bostic] should . . . start with" and what "would be a good mix" of inventory.

On October 5, 2000, Upshaw telephoned Brown seeking to purchase from Brown 85 firearms at a gun show to be held a few days later. That request prompted Brown to seek direction from the ATF. In communicating with that bureau on October 6, 2000 about

Upshaw's purchase request, Brown related that "they" – namely, Bostic and Upshaw – "planned on opening a store in Ohio, one in Buffalo."

Brown, of course, had every incentive to accurately describe the proposed purchase to the federal official – the point of that conversation was to get the proverbial "green light" for the sale based on what Brown told the ATF. Based on those representations Brown received approval to make the sale, and based on that approval Brown sold Upshaw 85 firearms in the aforementioned cash transaction on October 8, 2000.[7] At bottom, the record clearly reflects that Brown "knew that [the guns were] likely to end up in New York" (see Siegel & Connors, NY Prac § 88, at 198; cf. concurring op at 13).

The judges who concur with the majority believe that Brown's operation was completely confined to Ohio inasmuch as he did not advertise in other states, solicit business in other states, or employ distributors in other states (see concurring op at 10). However, Brown's June 24, 2000 interaction with Bostic was simply marketing to someone who sought to distribute Brown's inventory in New York State. In that meeting, which he thought to have lasted for "probably 45 minutes," Brown "share[d] [with Bostic] some of [Brown's] knowledge and experience about being a gun dealer." By Brown's own admission, Bostic told Brown that Bostic was "from Buffalo" and "wouldn't mind having a shop in Buffalo." Critically, before the sale of the weapon that was used to shoot plaintiff, Brown also knew that Upshaw and Bostic had a business link and, in Brown's

---

[7]      The gun with which Caldwell eventually shot plaintiff was sold in this transaction.

words, that "*they planned on opening a store . . . in Buffalo*."[8]  Given that evidence, and given the large quantity of guns that Brown sold to Bostic and his associates,[9] the only reasonable conclusion is that Brown served the New York market (see generally Darienzo v Wise Shoe Stores, 74 AD2d 342, 346 [2d Dept 1980]; Keenan v Kurz-Hastings, Inc., 175 F3d 236, 242 [2d Cir 1999]).

### III.

For Brown to be subject to personal jurisdiction the use of "the long-arm statute must comport with federal constitutional due process requirements" (Rushaid, 28 NY3d at 330-331, citing LaMarca, 95 NY2d at 216; see generally World-Wide Volkswagen Corp. v Woodson, 444 US 286, 292 [1980]).  To satisfy federal due process demands, two criteria must be met: "[1] a nondomiciliary must have 'certain minimum contacts with [the forum] such that [2] the maintenance of the suit does not offend traditional notions of fair play and substantial justice' " (Rushaid, 28 NY3d at 331, quoting International Shoe, 326 US at 316

---

[8]     Remarkably, neither the majority nor the concurring writings acknowledge this statement.  Those writings also avoid the elementary rule of this Court that, "[o]n a motion for summary judgment, facts must be viewed 'in the light most favorable to the non-moving party' " (Vega, 18 NY3d at 503, quoting Ortiz v Varsity Holdings, LLC, 18 NY3d 335, 339 [2011]).

[9]     The judges concurring with the majority note that, "[i]n the year 2000, when the firearm sales at issue were made to Bostic, Brown sold only 9 out of 525 firearms to out-of-state residents, accounting for less than 2% of his total sales" (concurring op at 13-14).  That point, however, overlooks the fact that, during the same year, Brown sold 182 guns to Bostic and his associates, which constituted 34% of Brown's gun sales by volume.  Although Bostic was an Ohio resident at the time of those sales, the point remains that, when those transactions were made, Brown knew of Bostic's intent to *resell those weapons in New York State*.

[internal quotation marks and citations omitted]).  "This in essence is another way of asking what is reasonable" (LaMarca, 95 NY2d at 217).

A.

As a majority of this Court concludes today (the judges who concur with the majority and us), CPLR 302 was "designed to be 'well within constitutional bounds' (12th Ann Report of NY Jud Conf, at 341 [emphasis added]), and subparagraphs (i) and (ii) of CPLR 302 (a) (3) 'were deliberately inserted' to achieve that goal (Ingraham v Carroll, 90 NY2d 592, 596-597 [1997])" (concurring op at 5).  A fortiori, if a non-domiciliary's actions satisfy CPLR 302 (a) (3) requirements, then the same conduct satisfies the federal minimum contacts test.[10]

Nevertheless--and without any explanation–the majority, including the judges who prefer to resolve this case on statutory grounds, holds that this is indeed one of these rare cases where the long-arm statute is out of step with federal due process (see D&R Global Selections, S.L. v Bodega Olegario Falcon Pineiro, 29 NY3d 292, 300 [2017]).  Exactly why is unclear.  The majority does not deign to explain to the lower courts how due process doctrine changed so as to suddenly make CPLR 302 exceed permissible constitutional

---

[10]     We have no occasion to opine whether, based on recent United States Supreme Court case law, CPLR 302 (a) (3) "must be read more narrowly than some New York cases have done" (see Oscar G. Chase & Lori Brooke Day, *Re-Examining New York's Law of Personal Jurisdiction After Goodyear Dunlop Tires Operations, S.A. v. Brown and J. McIntyre Machinery, Ltd. v. Nicastro*, 76 Alb L Rev 1009, 1039–1052 [2013]; see also J. McIntyre Mach., Ltd. v Nicastro, 564 US 873, 885–887 [2011] [Kennedy, J., plurality op]).  It also is unnecessary in the context of this appeal to determine whether the outer boundary of section 302 (a) (3) and the minimum contacts test under the Fourteenth Amendment are doctrinally coterminous.

bounds. It also refuses to explain why, if CPLR 302 is indeed unconstitutional as applied to Brown, we would not construe it to return to its proper place well within constitutional bounds (cf. concurring op at 6; Overstock.com, Inc. v New York State Dept. of Taxation & Fin., 20 NY3d 586, 593 [2013] ["courts must avoid, if possible, interpreting a presumptively valid statute in a way that will needlessly render it unconstitutional"]; Fantis Foods v Standard Importing Co., 49 NY2d 317, 327 [1980] [courts must construe statutes to "avoid grave doubts concerning (the statutes') constitutionality"]; see also Vincent C. Alexander, Practice Commentaries, McKinney's Cons Laws of NY, CPLR 302:11). However, given that the majority rests its decision solely on the absence of "minimum contacts" (see majority op at 4), we explain why that analysis is at odds with the law and the facts.

This Court has held that the requisite "minimum contacts exist where a defendant 'purposefully avails itself of the privilege of conducting activities within the forum state'" (Rushaid, 28 NY3d at 331, quoting LaMarca, 95 NY2d at 216). That test has "has come to rest on whether a defendant's 'conduct and connection with the forum State' are such that it 'should reasonably anticipate being haled into court there' " (LaMarca, 95 NY2d at 216, quoting World-Wide Volkswagen, 444 US at 297; see Rushaid, 28 NY3d at 331). "A non-domiciliary tortfeasor has 'minimum contacts' with the forum State--and may . . . reasonably foresee the prospect of defending a suit there--if it ' "purposefully avails itself of the privilege of conducting activities within the forum State" ' (LaMarca, 95 NY2d at 216, quoting World-Wide Volkswagen, 444 US at 297, itself quoting Hanson v Denckla, 357 US 235, 253 [1958]).

The majority's view of minimum contacts is unsupported by United States Supreme Court jurisprudence. For example, in the seminal case of <u>World-Wide Volkswagen Corp. v Woodson</u> (444 US 286 [1980]), the Supreme Court distinguished cases in which manufacturers purposefully direct their products into a forum state from those in which the product entered the forum by happenstance. In <u>World-Wide Volkswagen</u>, Seaway Volkswagen (Seaway)–a New York car dealer--sold an Audi vehicle to a family that lived in New York. The family later left this state for a new home in Arizona. As the family passed through Oklahoma, another car struck the Audi in its rear, "causing a fire which severely burned a plaintiff-spouse and her two children" (<u>id.</u> at 288).

The family subsequently commenced a products liability action in Oklahoma against, among others, Seaway and World-Wide Volkswagen Corp., which distributed the Audi, alleging that the family's "injuries resulted from defective design and placement of the Audi's gas tank and fuel system" (<u>id.</u>). The United States Supreme Court concluded that jurisdiction against Seaway and World-Wide Volkswagen "failed because [those] New York defendants could not reasonably foresee being sued in Oklahoma based on 'the fortuitous circumstance that a single Audi automobile, sold in New York to New York residents, happened to suffer an accident while passing through Oklahoma' " (<u>LaMarca</u>, 95 NY2d at 216-217, discussing <u>World-Wide Volkswagen</u>, 444 US at 295). " '[I]f the sale of a product of a manufacturer or distributor . . . is not simply an isolated occurrence, but arises from the efforts of the manufacturer or distributor to serve directly or indirectly, the market for its products in other States," the Supreme Court ruled that it would not be

"unreasonable to subject it to suit in one of those States if its allegedly defective merchandise has there been the source of injury to its owner or to others' " (id. at 297).

World-Wide Volkswagen's "no happenstance" rule applies here in support of personal jurisdiction in New York. The evidence establishes that Brown intended to serve the New York State market.[11] Viewed, as it must be, in the light most favorable to plaintiffs (see Vega, 18 NY3d at 503), the evidence reflects that–before the subject sales--Brown knew that Bostic was "from Buffalo" and that Bostic "planned on opening a store . . . in Buffalo" (cf. majority op at 6). Indeed, Brown thought it significant to advise an ATF agent that Bostic intended to sell guns in Buffalo. Given that evidence, Brown clearly served the New York market when he sold a large quantity of guns to Bostic and his cohorts knowing that those weapons were headed for the New York market.[12]

The majority reaches a different conclusion, reasoning that the travel of the subject guns from Ohio into New York State was merely a "fortuitous circumstance" that arose "through no marketing or other effort of defendant" (majority op at 4 [internal quotation marks omitted]). We respectfully disagree. The evidence the parties placed before the

---

[11]   The fact that Brown did not hire Bostic as his distributor is of no moment because Bostic was a de facto distributor of Brown's firearms – reselling guns in Buffalo that were sold to him by Brown with Brown's knowledge of their intended New York destination. This arrangement proved profitable time and time again, and constitutes Brown's "purposeful availment" of the New York gun market, "with the expectation that [his products would] be purchased by consumers in [this] State" (World-Wide Volkswagen, 444 US at 298).

[12]   Contrary to the majority's suggestion, we do not theorize that Brown and Bostic conspired "to sell guns on the New York black market" (majority op at 7 n 1).

motion court shows, in relevant part, Brown availed himself of the New York market by selling weapons to Bostic, who Brown understood would resell them in New York State. Bostic did not buy 182 identical guns for his personal use in Ohio.[13]

Nevertheless, the majority has broken new ground in interpreting the "minimum contacts" requirement stringently in this case—and in contravention of our precedent. The majority's approach shields gun traffickers and their suppliers from civil liability in New York. It has done so without citation to any authority that squarely supports its result, or any explanation as to why this is one of those "rare" instances in which the minimum contacts necessary to satisfy federal due process requirements are not present even though the long-arm jurisdiction is proper pursuant to CPLR 302 (see D&R Glob. Selections, 29 NY3d at 300; Rushaid, 28 NY3d at 331)

B.

To break that new ground, the majority joins the Appellate Division (see 159 AD3d at 157) in depending heavily upon Walden v Fiore (571 US 277 [2014]). Like the

---

[13]     Unsurprisingly, the civil personal jurisdiction jurisprudence of the United States Supreme Court and of our Court has developed solely in matters involving legitimate business enterprises (see LaMarca, 95 NY2d at 213 [manufacturer of garbage hauling equipment]; see also Burger King v Rudzewicz, 471 US 462, 464 [1985] [fast food]; World-Wide Volkswagen, 444 US at 28 [automobile manufacturer]; International Shoe, 326 US at 313 [travelling shoe salesmen]). That jurisprudence does not translate wholesale to cases in which minimum contacts, fair play, and substantial justice are applied to allegedly negligent or wrongful sales that affected the subject forum through a criminal enterprise. Although this question has not yet been litigated on the merits, if plaintiffs prove at trial that Brown knew or should have known that Bostic intended to sell guns illegally, then it would follow that Bostic specifically identified Ohio and New York as the states in which he expected to sell those guns illegally, and Brown would knowingly have supplied him the means of doing so.

concurrence here, the Appellate Division concluded that Brown lacks the minimum contacts with New York based on evidence submitted by Brown that showed, among other things, that Great Lakes "was an Ohio retailer permitted to sell guns within Ohio only" (159 AD3d at 157); that "during the relevant period from 1996 to 2005 [Great Lakes] did not maintain a website, had no business telephone listing, did not advertise in New York" (id. at 157-158); and that Great Lakes "made its retail sales and transfers to customers present in Ohio" (id. at 158; see concurring op at 12-13).  Like the majority here, the Appellate Division also coupled those facts with snippets from Walden (571 US 277), to the effect that the minimum contacts "must arise out of contacts that the 'defendant himself' creates with the forum State" (id. at 284 [emphasis added], quoting Burger King, 471 US at 475), or that Brown must have "purposefully 'reach[ed] out beyond' " Ohio and into New York (Walden, 571 US at 285).  "Instead," in the words of the Appellate Division, "Bostic and his associates came to Ohio [trade] shows where they purchased [the subject guns] and then unilaterally elected to transport them to Buffalo for resale on the illegal market" (159 AD3d at 158; see majority op at 6).

There are at least two flaws with that analysis.  *First*, the facts of Walden are inapposite to those of this case.  In Walden, gamblers travelling from Puerto Rico to Nevada happened to change planes in Atlanta, where a DEA agent, alerted by a drug-sniffing dog, intercepted a large quantity of cash they were carrying.  The gamblers sued the DEA agent in Nevada, seeking return of the monies.  The United States Supreme Court held that the agent "lack[ed] the minimal contacts with Nevada that are a prerequisite to the exercise of jurisdiction over him" (id. at 288 [internal quotation marks omitted]).  In so

holding, the Court relied on the following facts: (1) "no part of [the DEA agent's] course of conduct occurred in Nevada" (id.); (2) the agent "approached, questioned, and searched [the plaintiffs], and seized the cash at issue, in the Atlanta airport" (id.); (3) the agent drafted the probable cause affidavit in Georgia and submitted it to a Georgia attorney (id.); and (4) the agent "never traveled to, conducted activities within, contacted anyone in, or sent anything or anyone to Nevada (id. at 288-289).

Here, Brown sold the subject guns to Bostic (and Upshaw) in Ohio knowing that Bostic intended to re-market those goods in Buffalo. Unlike Walden, where the non-domiciliaries lacked *any* contacts and without even *indirect* interaction with the forum, Brown "purposefully direct[ed] his activities at residents of the forum" and plaintiffs' "litigation results from alleged injuries that arise out of or relate to those activities," establishing personal jurisdiction over Brown in New York State (Burger King, 471 US at 472 [internal quotation marks omitted]). Similarly, Walden does not justify the invocation of federal due process grounds so as to suppress the interests of residents of New York in seeking recovery for personal injuries allegedly sustained as a result of the negligent distribution and sale of handguns.[14]

---

[14]    The remaining authorities cited by the majority merely consider the legal standard used to answer the question whether the application of long-arm jurisdiction here comports with federal due process considerations. International Shoe (326 US 310) formulated the "minimum contacts" theory of personal jurisdiction, which provides, that among other things, for a defendant not present within the territory of the forum to be subject to a judgment therein, he must have a threshold level of association – minimum contacts – with that forum (see id. at 316; see also Milliken v Meyer, 311 US 457, 463 [1940]). International Shoe also deemed amenable to suit in the State of Washington a corporation that was headquartered in Missouri and that employed a team of salespersons in the State of Washington (see International Shoe, 326 US at 313, 320).

*Second*, the best analogy to Supreme Court precedent that may be drawn here is not to Walden (571 US 277), but to Calder v Jones (465 US 783 [1984]).  There, the Supreme Court ruled the aiming of allegedly libelous statements about a California resident at the California market was sufficient to establish jurisdiction in California over the editor and author of the magazine story in which those statements were made.  Although the reporter and the editor prepared the story almost entirely in Florida and had no relevant contacts with California (see id. at 785-786), the Supreme Court concluded that the California circulation of the magazine in which that story was published supported the assertion of jurisdiction in California over those Florida defendants (see id. at 789).

Underpinning that conclusion was the Supreme Court's observation that "[a]n individual injured in California[--the forum state--] need not go to [a different state] to seek redress from persons who, though remaining in [that different state], knowingly cause injury in [the forum state]" (id. at 790).  The same principle should apply here.  Much as the injury-producing magazine article in Calder (465 US 783) was "expressly aimed at California" (id. at 789), the allegedly negligent sale and distribution of firearms here was aimed at New York State inasmuch as Brown knew that Bostic had ties to Buffalo, and that

---

Those facts have no relation to those of this case, much as the facts of the other case on which the judges concurring with the majority rely have no similarity to those of this matter.  World-Wide Volkswagen (444 US 286), as noted, considered a failed effort to assert long-arm jurisdiction over defendants that retailed a vehicle that was sold in New York and that found its way into Oklahoma–where the accident occurred and where an action against those defendants was commenced--without any even indirect attempt of those defendants to serve that market.

Bostic and Upshaw "planned on opening a store . . . in Buffalo" before he sold a large quantity of handguns to them.

This Court's own decision in LaMarca v Pak-Mor Mfg. Co. (95 NY2d 210 [2000]) also supports jurisdiction over Brown. There, we concluded that a sanitation equipment manufacturer that "ha[d] no property, offices, telephone numbers or employees in this State," but that [did] "maintain a New York distributor . . . and a district representative" (id. at 213) had minimum contacts with this state (id. at 216). Specifically, under those facts, we determined that the manufacturer "took purposeful action, motivated by the entirely understandable wish to sell its products here" (id. at 217) and therefore "had every reason to foresee that its self-initiated contact with New York raised the prospect of defending [the subject lawsuit]" (id.). Similarly, here, Brown's actions in supplying a gun trafficker whom Brown knew to serve the New York market supports the conclusion that Brown's actions were "expressly aimed" at New York, and that courts of this state should have jurisdiction over him (see id.; see also Darrow v Hetronic Deutschland, 119 AD3d 1142 [3d Dept 2014] ["In view of (a) purposeful distribution arrangement, (the) defendant sought to indirectly market its product in New York and, thus, should have reasonably expected a manufacturing defect to have consequences in this state"]).

The conclusion that the "minimum contacts" threshold cannot be met here also ignores Burger King Corp. v Rudzewicz (471 US 462 [1985]), which stands for the proposition "the Due Process Clause may not readily be wielded as a territorial shield to avoid interstate obligations that have been voluntarily assumed" (id. at 474). In that case, the Supreme Court concluded that Michigan residents who negotiated with a Florida

corporation (Burger King) for the purchase of a franchise to be located in the Detroit, Michigan area were subject to long-arm jurisdiction in Florida —even though one of the defendants "did not maintain offices in Florida and . . . never even visited there" (id. at 478-479).  That conclusion rested in part on the principle that "[a] State generally has a 'manifest interest' in providing its residents with a convenient forum for redressing injuries inflicted by out-of-state actors" (id. at 473), and in part on the idea that, where individuals "purposefully derive benefit" from their interstate activities, it may well be unfair to allow them to escape having to account in other States for consequences that arise proximately from such activities" (id. at 473-474 [internal citation omitted and emphasis added]). Indeed, the Court added, "the Due Process Clause may not readily be wielded as a territorial shield to avoid interstate obligations that have been voluntarily assumed" (id. at 474).

Shielding is precisely what the has happened in this case. Faced with a dearth of authorities to support their conclusion that our long-arm jurisdiction statute has suddenly become unconstitutional as applied, the majority nevertheless applies the Federal Constitution to reach precisely the opposite conclusion to that reached by the United States Supreme Court. The Supreme Court has explained "[j]urisdiction is proper . . . where the contacts proximately result from actions by the defendant himself that create a substantial connection with the forum State" (id. at 474 [internal quotation marks omitted]).  That connection need not arise from activities within a State; rather, it may inure where a nonresident simply "purposefully directs his [or her] activities toward forum residents" (id. at 473 [internal quotation marks omitted]).

Here, Bostic effectively acted as a distributor of Brown's products in this state. The record reflects that Brown marketed to Bostic as a New York State businessperson in an effort to move Brown's inventory. At his deposition, Brown acknowledged that Upshaw was with Bostic when Brown met with Bostic at a June 2000 gun show, that Upshaw knew about the stores that Bostic intended to open, and that Brown knew that Upshaw planned to open the stores with Bostic. At the same meeting, Bostic and Upshaw collectively purchased 13 guns from Brown; five were purchased by Bostic, and eight were bought by Upshaw. Brown "had some assumptions" that Bostic and Upshaw were partners at that time and, as of September 2000, he thought that Bostic and Upshaw might be "dealers."

Brown also acknowledged that his interaction with Bostic included "a lot of talk regarding . . . a retail shop . . ., how many [of the subject devices Bostic] should . . . start with, [what] would be a good mix[, and] different items with regard to opening a retail store." That conversation lasted "probably 45 minutes," and the record reflects such dialogue occurred before the subject sale.

Consequently, Brown's sales to Bostic (in an enterprise that flirted with the bounds of legality, as evinced by Bostic's plea of guilty to federal crimes arising from these transactions) undoubtedly benefitted Brown by expanding his market beyond local purchasers to New York distributors. Brown purposefully derived benefit from the re-sale of guns Brown sold to people whom he knew to be New York distributors (see generally id. at 473-474). Thus, Brown's conscious sale of weapons to be marketed and sold in New York satisfies the minimum contacts test.

C.

The majority, having concluded that minimum contacts do not exist, has no occasion to consider whether personal jurisdiction offends " 'notions of fair play and substantial justice' " (Rushaid, 28 NY3d at 331, quoting Burger King, 471 US at 477).  It does not.

"Once it has been decided that a defendant purposefully established minimum contacts within the forum State, these contacts may be considered in light of other factors to determine whether the assertion of personal jurisdiction would comport with 'fair play and substantial justice' " (id. at 476, quoting International Shoe, 326 US at 320).  The fair play element is one of rationality; "[w]here minimum contacts exist, the defendant has the burden to 'present a compelling case that the presence of some other considerations would render jurisdiction unreasonable' " (D&R Global Selections, 29 NY3d at 300, quoting LaMarca, 95 NY2d at 217-218 [citation and internal quotation marks omitted]).  The question whether personal jurisdiction is reasonable specifically turns on five factors: " 'the burden on the defendant' "; " 'the forum State's interest in adjudicating the dispute' "; " 'the plaintiff's interest in obtaining convenient and effective relief' "; " 'the interstate judicial system's interest in obtaining the most efficient resolution of controversies' "; and " 'the shared interest of the several States in furthering fundamental substantive social policies' " (Rushaid, 28 NY3d at 331, quoting Burger King, 471 US at 477; see World-Wide Volkswagen, 444 US at 292).

In this case, each factor favors adjudicating plaintiffs' claims in New York.[15]  First, the burden on Brown would be essentially nothing because he is already involved in this litigation as the sole owner and chief executive of MKS, which has not contested personal jurisdiction in New York.  Second, New York's interest in adjudicating this dispute is high. Plaintiffs are New York residents whose claims stem from serious injuries that occurred within New York as a result of the illegal trafficking of firearms into New York.  Third, plaintiffs have a strong interest in adjudicating their claims in this state: they reside in New York and Williams was shot here.  Fourth, resolving plaintiffs' claims against Brown in New York is the most efficient use of interstate judicial resources because plaintiffs have already alleged related claims against other defendants stemming from the same gun sales. Requiring them to initiate a separate parallel action in Ohio against Brown—who, irrespective of this Court's decision, will remain involved in the New York proceeding as sole owner and CEO of MKS—will waste interstate judicial resources.

Fifth, and perhaps most significantly, subjecting Brown to jurisdiction in New York will "further[] fundamental substantive social policies" (Asahi Metal Indus. Co. v Superior Court of Cal., 480 US 102, 114 [1987]).  Principles of federalism and comity support exercising jurisdiction over dealers like Brown who supply the illegal interstate gun market.  It will be for a trial on the merits (or, perhaps, multiple trials, conducted contemporaneously in New York as to the defendants remaining in this suit and in Ohio

---

[15]      In his brief to this Court, Brown addresses only the first factor, contending that it would be "an unreasonable burden on him" to face suit in New York because he "is an Ohio resident doing business exclusively in the state of Ohio."  He has not contested that the remaining factors support exercise of jurisdiction.

against Brown) to establish what Brown knew and whether—as plaintiffs have been allowed to plead (see 100 AD3d 143)— he violated federal law such as to give rise to tortious liability.

However, assuming plaintiffs will succeed on the merits, it is clear that New York has a very substantial interest in protecting its citizens by imposing tort liability on gun sellers who violate federal law. A recent study conducted by the Office of the Attorney General of New York State shows that "law enforcement agencies . . . frequently disrupt[] gun trafficking schemes that purchase firearms, predominantly handguns, in states south of New York . . . and that transport the weapons to New York markets" (Target on Trafficking: New York Gun Crime Analysis, Office of the New York State Attorney General, available at https://targettrafficking.ag.ny.gov/ [last accessed Apr. 16, 2019]). Downstate areas are supplied by a stream of trafficked firearms that flow into New York State along the Interstate 95 Corridor from states including Pennsylvania, Virginia, North Carolina, South Carolina, Georgia, and Florida. That steady stream of firearms flowing from those "exporter" or "supplier" states has been nicknamed "the Iron Pipeline," and the Attorney General's study reflects that, at one point, approximately 75% of the likely-trafficked guns in New York City entered the state through that channel (see id.).

The Buffalo area, in turn, is supplied in trafficked weapons principally by guns sold in and moved from Pennsylvania, Georgia, and Ohio (see id.). The flow of trafficked guns into New York State from all of the aforementioned states should come as no surprise. "From New York's vantage point, the correlation between state and local laws and the source of trafficked guns is undeniable" (id.). Gun laws in "Iron Pipeline" states and in

Ohio are lax, while the gun control laws in New York State are strong.  It follows that the direct links between those areas and New York State provided by, among other things, interstate highways, have made them "become the source-of-choice among gun traffickers running guns into New York" (id.).

That data contained in that study, of course, is insufficient to establish that Brown himself accepted the benefits of the New York State economy, or that this state was an anticipated marketplace for those weapons.  That study, however, also reflects the obvious point that gun shows in states with weak gun control laws attract out-of-state buyers.  This state is entitled to protect its citizens from the effects of those weak gun control laws by telling out of state gun sellers—including and indeed especially legitimate ones—that they must take every precaution to avoid supplying gun traffickers and will be held accountable when they negligently fail to do so.  Under our federal system, Ohio is free to regulate firearms differently, but it has no legitimate interest in serving as a marketplace for gun traffickers and those who seek to flout New York's laws.

IV.

All of the guns sold by Brown to Bostic and his associates were Hi Point 9mm semi-automatic pistols, which plaintiffs have characterized as a "Saturday Night Special"—that is, as an "inexpensive, low quality, easily concealable gun that has little or no sporting value or utility."  Stated differently, and as accurately described by plaintiffs, those weapons "are cheap, low quality, easily concealable guns that are disproportionately used by criminals and widely recognized as having little or no legitimate value or utility."  In short, they are "junk guns," practically purposed only to cause harm to other human beings.

The shows at which Brown sold those weapons were held in Ohio, where gun control laws are less strict than the laws of New York. In point of fact, according to plaintiffs, in the 12 years leading up to the sale of the subject guns to Bostic, the ATF has determined that over 10,000 guns sold by Beemiller have been used in crimes. That figure, of course, represents only the guns the ATF was able to successfully trace following a gun crime.

Tracing of such weapons has also revealed that about 100 of the guns brought by Bostic into New York State were used for criminal purposes. News accounts of the wide-ranging and tragic consequences of Bostic's actions starkly portray the menace that he was to the Buffalo community:

> "The crack of gunfire got louder and more frequent on Buffalo streets after [Bostic] illegally sold [the weapons he purchased at Ohio gun shows] on the city streets to any drug dealer, petty thief or gang member who wanted a cheap pistol. The weapons [were] tied to murders, assaults, robberies and kidnappings. Some were used to shoot at police. And the violence continue[d] [unchecked through at least 2005]" (*Gun by Gun: Five Years of Damage Done by Weapons James Nigel Bostic Bought from Ohio Gun Dealers*, Buffalo News, June 12, 2005, available at https:// buffalonews.com/2005/06/12/gun-by-gun-five-years-of-damage-done-by-weapons-james-nigel-bostic-bought-from-ohio-gundealers/ [last accessed Apr. 4, 2019]).

This case cries out for the Court to simply apply the rule of law. Perversely, the Court's decision today elevates Ohio gun laws over our own. Apart from the injustice done here, the majority's erroneous holding has statewide impact as it shields gun traffickers and their suppliers from civil liability in this state, imperiling the public and undermining the public policy of our own gun laws.

Such an outcome is not compelled by – and, in fact, is contrary to--our law[16] and the requirements of federal due process. Indeed, the law of the United States Supreme Court and this Court *strongly supports* the application of long-arm jurisdiction where, as here, Brown at least indirectly served the marketplace in this state (see generally World-Wide Volkswagen, 444 US at 297-298) and purposefully and voluntarily derived a benefit from interstate activity (see generally Burger King, 471 US at 474, 478-479) aimed at this state (see generally Calder, 485 US 683; LaMarca, 95 NY2d at 215).

The nature of the device in question — a gun that was one of many such devices sold by Brown to Bostic in conjunction with Bostic's announced efforts to establish a foothold in the New York State marketplace — lends even greater support to the application of personal jurisdiction in New York. Where, as here, "a defendant deals in [] inherently dangerous products a lesser showing than is ordinarily required will support jurisdiction" (City of New York v A-1 Jewelry & Pawn, Inc., 501 F Supp 2d 369, 420 [ED NY 2007]). "[A] . . . defendant who deals in handguns should expect to be held accountable on a lesser showing than one who sells something as harmless are rubber bands" given the "inherent interest" the state has in the dangerous product (id.), and it

---

[16] If the shoe was on the other foot here – that is, if Ohio attempted to assert long-arm jurisdiction over a New York resident who was alleged to have negligently sold and distributed a firearm to a black-market dealer whose trafficking of that gun in Ohio led to the shooting of an Ohio resident – the result would be the same. The Ohio long-arm statute allows a court to "exercise personal jurisdiction over a person who acts directly or by an agent, as to a cause of action arising from the person's . . . [c]ausing tortious injury in [Ohio] by an act or omission outside [Ohio] if [the person] . . . derives substantial revenue from goods used or consumed or services rendered in [Ohio]" (Ohio Rev Code Ann § 2307.382).

follows that federal courts have recognized that due process is satisfied and that jurisdiction can be exercised over out-of-state firearms suppliers who sold guns that are trafficked over state lines (see e.g. id.; Johnson v Bryco Arms, 304 F Supp 2d 383 [ED NY 2004]).

We should reach the same conclusion in this case. The courts of this state may exercise personal jurisdiction over Brown in this matter. The exercise of that long-arm jurisdiction comports with federal due process.[17] There is simply no basis, in law, to deny Daniel and his father their day in court against Brown.

We respectfully dissent.

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Order affirmed, with costs. Opinion by Chief Judge DiFiore. Judges Stein, Garcia and Feinman concur, Judge Feinman in a concurring opinion in which Judge Garcia concurs. Judge Fahey dissents in an opinion in which Judges Rivera and Wilson concur.

Decided May 9, 2019

---

[17]    In view of our conclusions, we have no occasion to address plaintiffs' alternative contentions that jurisdiction should be conferred over Brown on the ground that MKS is his agent or an alter ego.